UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

| | |
|---|---|
| JEB D. SLOAN, Individually and on Behalf of All Others Similarly Situated, <br><br>                                Plaintiff, <br><br>       vs. <br><br> STIFEL FINANCIAL CORP., STIFEL, NICOLAUS & COMPANY, INC., and STIFEL BANK & TRUST, <br><br>                            Defendants. | No. <br><br> <u>CLASS ACTION</u> <br><br> CLASS ACTION COMPLAINT <br><br><br><br><br> <u>JURY TRIAL DEMANDED</u> |

By and through his undersigned counsel, Jeb D. Sloan ("Plaintiff") brings this class action against defendants Stifel Financial Corp. ("Stifel"), Stifel, Nicolaus & Company, Inc. ("SN&C"), and Stifel Bank & Trust ("SB&T") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by Stifel with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to Stifel's Automatic Cash Investment Service, which offers two automatic cash sweep programs: the Stifel Insured Bank Deposit Program and Stifel Insured Bank Deposit Program for Retirement Accounts. Under these programs, Defendants sweep idle cash balances from customers' securities accounts into interest-bearing deposit accounts at banks affiliated with or otherwise selected by Defendants.

2.     The cash sweep accounts are highly lucrative for Defendants and Stifel's banks but pay unreasonably low interest rates to customers. As such, Defendants use them to generate massive revenue for themselves at the expense of their customers. In 2023, for example, Stifel reported that its banking unit earned an average of 6.08% interest on bank deposits, of which customer cash swept under Stifel's cash sweep programs represented an average of over $9 billion. In exchange for its access to customer cash, however, Stifel's banks paid rates of interest as low as 0.15%. The staggering difference, or "spread," between the miniscule rates passed along to

customers and the average returns earned from the use of this low-cost cash contributed in large part to Stifel's record net interest income of over $1 billion for the year.

3.      Defendants' use of their sweep programs to enrich themselves by paying unreasonably low interest rates to customers breached their fiduciary duties and contractual obligations and violated several state and federal laws including the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute") and the Investment Advisers Act of 1940 ("Advisers Act").

### JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c), 28 U.S.C. §1331, and 15 U.S.C. §80b-14 because Plaintiff brings claims arising under the RICO Statute, 18 U.S.C. §1962, and the Advisers Act, 15 U.S.C. §§80b-1-80b-21.

5.      This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants were incorporated in, had offices in, did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of Missouri through the promotion, sale, marketing, distribution, and operation of their products and services.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants were headquartered in, transacted business in, and had offices in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

7.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails and interstate telephone communications.

## PARTIES

**Plaintiff**

8.    Plaintiff Jeb D. Sloan is a citizen of Indiana.  During the relevant time period, Plaintiff held both a Roth IRA and Traditional IRA account with Stifel.  Idle cash balances Plaintiff held in these accounts were swept into the banks that Defendants selected in their discretion at the unreasonably low interest rates alleged herein.

**Defendants**

9.    Defendant Stifel Financial Corporation is a Delaware corporation headquartered at 501 North Broadway, St. Louis, Missouri 63102.  Stifel is a financial services company that conducts business throughout the United States, with approximately $38.9 billion in assets and approximately 9,000 employees.  Stifel is the parent company and control person of SN&C and SB&T.

10.    Defendant Stifel, Nicolaus & Company, Inc. is a Missouri corporation headquartered at 501 North Broadway, St. Louis, Missouri 63102.  SN&C is a broker-dealer and a Registered Investment Advisor that offers brokerage and investment advisory services to its nationwide client base, with approximately $458 billion in assets under management.  During the relevant time period, SN&C acted as agent for the establishment, maintenance, and operation of the Defendants' cash sweep programs.  SN&C is a wholly owned subsidiary of Stifel.

11.    Defendant Stifel Bank & Trust is a Missouri-chartered bank and trust company and Member FDIC headquartered at 501 North Broadway, St. Louis, Missouri 63102.  During the relevant time period, SB&T acted as sub-custodian and sub-agent for the establishment,

maintenance, and operation of the Defendants' cash sweep programs.  SB&T is a wholly owned subsidiary of Stifel.

## SUBSTANTIVE ALLEGATIONS

**Background on Defendants' Sweep Programs**

12.    Stifel is a publicly traded financial services firm.  During the relevant time period, Stifel's wholly owned subsidiary, SN&C, offered, and still offers, brokerage and investment advisory services to customers nationwide.  These services include the Stifel Automatic Cash Investment Service, which offers two automatic cash sweep programs called the Stifel Insured Bank Deposit Program ("IBD Program") and Stifel Insured Bank Deposit Program for Retirement Accounts ("RIBD Program") (collectively, "Sweep Programs").  The IBD Program sweeps cash from non-retirement accounts, while the RIBD Program sweeps cash from retirement accounts.

13.    The terms and conditions of the IBD Program and RIBD Program are set forth and incorporated in the Stifel Account Agreement and Disclosure Booklet ("Account Agreement"), which is posted on Stifel's public website.[1]  The Account Agreement is governed by Missouri state law.

### A.    IBD Program

14.    Under the IBD Program, SN&C automatically sweeps eligible clients' idle cash balances into interest-bearing deposit accounts ("Deposit Accounts") at a network of bank partners selected by the Defendants ("Sweep Banks").[2]  The participating Sweep Banks are listed on

---

[1]    Stifel, *Stifel Account Agreement and Disclosure Booklet*, https://www.stifel.com/docs/pdf/Disclosures/AgreementAndDisclosureBooklet.pdf (last visited May 5, 2025).

[2]    *Id.* at 146.

Priority Bank Lists, which are posted on Stifel's public website.[3]  Funds in the IBD Program Deposit Accounts were insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000.

15.    The Sweep Banks appear on the Priority Bank Lists in the order in which SN&C opens Deposit Accounts on behalf of its IBD Program clients.[4]  The first Sweep Bank listed on the Priority Bank Lists represents the first Sweep Bank to which SN&C sweeps idle cash balances. When deposits exceed the deposit limit of $246,500 for individuals (or $493,000 for joint accounts) at the first Sweep Bank, SN&C sweeps additional idle cash balances to the next Sweep Bank listed on the Priority Bank Lists.[5]

16.    For IBD Program clients, the Account Agreement states that up to four Sweep Banks on the Priority List will be affiliated with Stifel and SN&C, and that those affiliated banks may include SB&T, Stifel Bank, Stifel Trust Company, N.A., and Stifel Trust Company Delaware, N.A. (collectively, "Affiliated Banks").[6]

17.    Since October 3, 2022, the Affiliated Banks have been the first four Sweep Banks on the Priority Bank Lists for all IBD Program clients.[7]  In other words, the first $986,000 of idle cash balances have since been, and continue to be, swept into Deposit Accounts at the Affiliated Banks.

---

[3]    Stifel, *Priority Bank Lists*, https://www.stifel.com/docs/pdf/Disclosures/SweepChoices/Priority-Bank-Lists/FDIC-Priority-Bank-List-20241209.pdf (Dec. 9, 2024).

[4]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1, at 147.

[5]    *Id.* at 146-47.

[6]    *Id.* at 146.

[7]    *See* Stifel, *FDIC Historical Bank Lists*, https://www.stifel.com/disclosures/sweep-choices/historical-bank-lists (last visited May 5, 2025).

18.    When idle cash balances exceed the deposit limits at the Affiliated Banks, SN&C opens Deposit Accounts at unaffiliated banks ("Unaffiliated Sweep Banks") and, in the order appearing on the Bank Priority Lists, deposits idle cash balances in Deposit Accounts at the Unaffiliated Banks up to the deposit limits stated above.[8]  In the event that all the Sweep Banks receive funds up to the deposit limit, the excess customer cash is swept into "Excess Banks" chosen by Defendants.  The Excess Banks accept funds "without limit and without regard to the FDIC insurance limit."[9]

19.    The Account Agreement provides that SN&C acts as an agent for customers in the IBD Program, stating, *inter alia*, that SN&C "is acting as [the customer's] agent in establishing and as [the customer's] custodian in holding the Deposit Accounts at each Bank, depositing funds into the Deposit Accounts, withdrawing funds from the Deposit Accounts, and transferring funds among the Deposit Accounts."[10]

20.    The Account Agreement additionally provides that SB&T acts as agent for customers in the IBD Program, stating that SN&C uses SB&T as a "sub-custodian – an agent to establish the Deposit Accounts at the Banks for [SN&C] – and to settle the deposit and withdrawal transactions with the Banks each business day."[11]

---

[8]    Stifel, *Account Agreement and Disclosure Booklet, supra* note 1 at 146.  1. The following is a non-exhaustive list of Unaffiliated Sweep Banks in the IBD: Bank of New York Mellon, Associated Bank, N.A., Wells Fargo Bank, N.A., EagleBank, Farmers and Merchants Bank, Bank of East Asia, Ltd., Capital One, National Association, UMB Bank National Association, Metro City Bank, Pinnacle Bank, US Bank National Association, Barclays Bank Delaware, Deutsche Bank Trust Company, and United Fidelity Bank, FSB.

[9]    *Id.* at 148.

[10]    *Id.* at 151.

[11]    *Id.*

21.    The Account Agreement states that the Sweep Banks participating under the IBD Program each "pay the same rate of interest on the Deposit Accounts within each Interest Rate Tier," that the rates of interest are "determined by the amount the Banks are willing to pay on the Deposit Accounts minus the fees paid to Stifel and other parties," and that the rates of interest "may change daily."[12]

**B.    RIBD Program**

22.    Under the RIBD Program, SN&C automatically sweeps retirement clients' idle cash balances into FDIC-insured Deposit Accounts at Affiliated Banks.[13]  The RIBD Program does not sweep idle cash balances into Deposit Accounts at the Unaffiliated Banks.

23.    The Bank Priority Lists similarly reflect the order in which SN&C sweeps idle retirement cash into the Affiliated Banks.  For example, the first Affiliated Bank on the Priority Bank List for retirement clients represents the first Affiliated Bank to which SN&C sweeps idle cash balances.  When retirement client deposits exceed the deposit limit of $246,500 for individuals at the first Affiliated Bank, SN&C sweeps idle cash balances to the next Affiliated Bank listed on the Priority Bank List.[14]

24.    When retirement-client deposits exceed $986,000 (the total of the deposit limits at the four Affiliated Banks), the excess cash is swept into Excess Banks chosen by Stifel.  The Excess Banks accept retirement customer deposits "without limit and without regard to the FDIC insurance limit."[15]

---

[12]    *Id.* at 149.

[13]    *Id.* at 153.

[14]    *Id.*; *see also* Stifel, *Priority Bank Lists*, *supra* note 3.

[15]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 155.

25.     The Excess Banks under the RIBD Program are the same Affiliated Banks to which retirement-client cash is swept until the total deposits exceed $986,000.[16]

26.     The Account Agreement provides that SN&C acts as an agent for customers in the RIBD Program, stating, *inter alia*, that SN&C "is acting as [the customer's] agent in establishing and as [the customer's] custodian in holding the Deposit Accounts at each Bank, depositing funds into the Deposit Accounts, withdrawing funds from the Deposit Accounts, and transferring funds among the Deposit Accounts."[17]

27.     In addition, the Account Agreement states that the Affiliated Banks each "pay the same rate of interest on the Deposit Accounts," that the rates of interest on deposits in the RIBD Program are "determined by the amount the Banks are willing to pay on the Deposit Accounts minus the fees paid to Stifel and other parties," and that the rates of interest "may change daily."[18]

28.     Participants in the Sweep Programs included clients investing through advisory accounts with SN&C.

**Defendants Reaped Significant Benefits from Their Sweep Programs to the Detriment of Customers, Who Were Paid Unreasonably Low Interest Rates**

29.     The Sweep Programs provide several highly lucrative financial benefits to Defendants and their Affiliated Banks. ***First***, the Affiliated Banks receive substantial deposits "at a price that may be less than other alternative funding sources available to them."[19] These deposits "provide a stable source of funds for the Affiliated Banks," which the Affiliated Banks use "to support a variety of activities, including, but not limited to, each of their lending activities, if

---

[16]    Stifel, *Priority Bank Lists*, *supra* note 3.

[17]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 158.

[18]    *Id.* at 157.

[19]    *Id.* at 151, 159.

any."[20]  In fact, as Stifel reported in its 2024 Form 10-K, bank deposits represent its "largest funding source," and those deposits "are **_primarily sourced_** by [its] multi-bank sweep program in which clients' cash deposits in their brokerage accounts are swept into FDIC-insured interest-bearing accounts at [its] bank subsidiaries and various third-party banks."[21]  To illustrate, as of December 31, 2024, the Affiliated Banks collectively reported holding over $9.95 billion in affiliate sweep deposits from the Sweep Programs.

30.    **_Second_**, Stifel's wholly owned subsidiaries, SN&C and SB&T, earn fees from the Sweep Programs. Under both Sweep Programs, SN&C "receives an aggregate, annual fee of up to $100 from the Affiliated Banks" for each participating securities account.[22]  In addition, under the IBD Program, unaffiliated banks pay SB&T "as much as 7.00 percent annually on balances in the Deposit Accounts."[23]  The Account Agreement gives SB&T discretion to set or reduce the fee paid by each Unaffiliated Bank.[24]

31.    **_Third_**, SB&T receives additional bank deposits under reciprocal deposit arrangements with the unaffiliated banks.  Under these arrangements, SB&T receives and accepts deposits from customers of the Unaffiliated Banks in amounts similar or equal to idle customer cash deposited into Deposit Accounts at the Unaffiliated Banks under the IBD Program.  This

---

[20]    _Id._

[21]    Stifel    Financial    Corp.,    Annual    Report    (Form    10-K)    (Feb.    26,    2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000720672/000095017025027702/sf-20241231.htm.

[22]    Stifel, _Account Agreement and Disclosure Booklet_, _supra_ note 1 at 151, 159.

[23]    _Id._ at 151.

[24]    _Id._

provides the Affiliated Banks with an additional stable source of funding "at a price that may be less than other alternative funding sources available to them."[25]

32.     Defendants were able to maximize their financial gain and their Affiliated Banks' financial gain from the Sweep Programs by automatically enrolling customers in the Sweep Programs and paying unreasonably low rates.  At the same time, Defendants guaranteed their Affiliated Banks always paid lower rates of interest on idle customer cash than the Unaffiliated Banks because of their placement as the first four Sweep Banks on the Priority Bank Lists.

33.     As an illustrative example, the following image[26] lists the deposit priority, effective December 9, 2024, for idle cash of customers located in Alabama, Arkansas, Florida, Georgia, Louisiana, Missouri, Mississippi, North Carolina, South Carolina, Tennessee, and Texas:

**List 1 (AL, AR, FL, GA, LA, MO, MS, NC, SC, TN, TX)**

| Position | Bank | City | State |
|---|---|---|---|
| 1 | Stifel Bank & Trust | St. Louis | MO |
| 2 | Stifel Bank | St. Louis | MO |
| 3 | Stifel Trust Company, N.A. | St. Louis | MO |
| 4 | Stifel Trust Company Delaware, N.A. | Wilmington | DE |
| 5 | Bank of New York Mellon | Pittsburgh | PA |
| 6 | Associated Bank, N.A. | Green Bay | WI |
| 7 | Wells Fargo Bank, N.A. | Sioux Falls | SD |
| 8 | EagleBank | Bethesda | MD |
| 9 | Farmers and Merchants Bank | Milford | NE |
| 10 | Bank of East Asia, Ltd. | New York | NY |
| 11 | Capital One, National Association | Glen Allen | VA |
| 12 | UMB Bank National Association | Kansas City | MO |
| 13 | Metro City Bank | Doraville | GA |
| 14 | Pinnacle Bank | Nashville | TN |
| 15 | US Bank National Association | Cincinnati | OH |
| 16 | Barclays Bank Delaware | Wilmington | DE |
| 17 | Deutsche Bank Trust Company | New York | NY |

By placing the Affiliated Banks at the top of the Bank Priority Lists, Stifel ensures its Affiliated Banks pay as low as 0.01% and not greater than 0.25% interest.

---

[25]  *Id.*

[26]  Stifel, *Priority Lists*, *supra* note 3 at 1.

34.     These circumstances created an admitted "conflict of interest" because "the profitability of the Affiliated Banks is determined in large part by the difference between the interest paid and other costs incurred by it on its deposit amounts (including amounts held through the Deposit Accounts), and the interest or other income earned on its loans, investments, and other assets."[27]

35.     Due to this adverse financial incentive, Defendants failed to pay, negotiate, and secure reasonable sweep interest rates for customers in the Sweep Programs.  As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

36.     The United States Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[28]

37.     Similarly, the U.S. Internal Revenue Service defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[29]  Thus, an interest rate is reasonable if it is based on a fair market valuation.

38.     In contrast, the Sweep Programs paid miniscule, below-market interest rates as low as 0.01%, depending on the amount of idle cash to be deposited on the client's behalf. The

---

[27]  Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 151-52, 159.

[28]  Grant of Individual Exemptions; Deutsche Bank AG, 68 Fed. Reg. 34646 (June 10, 2003).

[29]  26 C.F.R. §1.482-2(a)(2).

following chart depicts a sampling of the yields paid on idle cash balances under both the IBD and RIBD Programs from 2020 through present:

| Deposit Tiers | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| (1) $1 to $99,999 | 0.01% | 0.01% | 0.15% | 0.15% | 0.15% | 0.01% |
| (2) $100,000 to $249,999 | 0.01% | 0.01% | 0.30% | 0.30% | 0.30% | 0.10% |
| (3) $250,000 to $499,999 | 0.01% | 0.01% | 0.45% | 0.45% | 0.45% | 0.15% |
| (4) $500,000 to $999,999 | 0.01% | 0.01% | 0.65% | 0.65% | 0.65% | 0.25% |
| (5) $1,000,000 to $1,999,999 | 0.01% | 0.01% | 0.75% | 1.50% | 1.50% | 1.00% |
| (6) $2,000,000+ | ---- | 0.01% | 1.25% | 2.00% | 2.00% | 1.50% |

39.    These rates were ***significantly*** below several objective benchmarks of reasonableness:

- **Other Interest-Bearing Accounts Offered by Defendants**.  The sweep rates paid by the Sweep Programs were far lower than the interest rates paid by other products offered by Defendants outside of the Sweep Programs. For example, Stifel offers its private banking clients the Insured Cash Sweep ("ICS") Program, which pays a yield of 3.15% on idle cash swept into FDIC-insured deposit accounts at a network of banks.[30] Similarly, Stifel's FDIC-insured "Smart Rate Program," which makes available a money market deposit account at the Affiliated Banks, currently offers a rate of 3.85% on deposits of $100,000 or more.[31]  By contrast, under the Sweep Programs, the Affiliated Banks pay rates of interest as low as 0.10% on deposits of $100,000 or more.

- **Federal Funds Rate**.  The sweep interest rates in the Sweep Programs were far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25%

---

[30]    Stifel, *Conveniently Protect Your Cash*, https://bankwithstifel.com/wp-content/uploads/2024/08/WealthInsuredCashSweep.pdf (last visited May 5, 2025).

[31]    Stifel, *Efficient Cash Management – Stifel Smart Rate Program*, https://www.stifel.com/docs/pdf/Individuals/CashManagement_IntroducingSmartRate.pdf    (last visited May 5, 2025).

to 4.50%.[32]  The federal funds rate "is the interest rate charged by banks to borrow from each other overnight," and "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."[33]

- **Treasury Bill Rates**.  The sweep interest rates in the Sweep Programs were far below U.S. Treasury bill rates, including the three-month and one-year rates currently at 4.20% and 3.77%, respectively.[34]

- **Repurchase Rate**.  The sweep interest rates in the Sweep Programs were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[35]

40.    These benchmarks individually and collectively demonstrate that Defendants' sweep interest rates have been, and remain, unreasonable.  Indeed, though Stifel has claimed its sweep rates are "generally impacted by the level of short-term interest rates," among other factors, the sweep rates paid by its Affiliated Banks have ***declined*** in the face of increasing benchmark rates.[36]  For example, on July 28, 2022, the Sweep Programs paid 0.15% on deposits up to $99,999, 0.30% on deposits between $100,000 and $249,999, 0.45% on deposits between $250,000 and $499,999, and 0.65% on deposits between $500,000 and $999,999.[37]  On that same day, the Federal

---

[32]  Federal Reserve, *Economy at a Glance – Policy Rate* (Jan. 30, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[33]  *Id.*

[34]  Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (May 2, 2025), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (May 2,, 2025), https://fred.stlouisfed.org/series/DTB1YR.

[35]  Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations* (May 2, 2025), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

[36]  Stifel Financial Corp., Annual Report (Form 10-K) (Feb. 26, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000720672/000095017025027702/sf-20241231.htm.

[37]  Stifel, *Interest Rates for the Stifel Insured Bank Deposit Programs* (effective July 28, 2022), https://web.archive.org/web/20220812220611/https://www.stifel.com/docs/pdf/disclosures/SweepChoices/FDIC%20Insured%20Bank%20Deposit%20Program%20RatesTiers.pdf.

Reserve's benchmark federal funds target range was 2.25% to 2.5%.[38]  Despite a marked increase in the benchmark federal funds target range to 5.25% to 5.50%, a 20-year high, Stifel now pays far lower rates of interest on all sweep deposits below $1,000,000.

41.    The rates offered by Stifel's competitors likewise experienced a tremendous rise since 2021.  For example, Fidelity automatically sweeps customers into a money market mutual fund with a current 7-day yield of 3.98%,[39] Vanguard automatically sweeps customers into a money market mutual fund with a current 7-day yield of 4.24%,[40] and R.W. Baird automatically sweeps certain eligible customers into a money market mutual fund with current 7-day yield of 3.96%.[41]  In or around 2021, however, the yields on all three sweep programs were nearly zero.

---

[38]  Federal Reserve, *Economy at a Glance – Policy Rate* (July 28, 2022), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[39]  Fidelity, *Fidelity Cash Management Account*, https://digital.fidelity.com/prgw/digital/fdic-interest-rate/fcma (last visited May 5, 2025).

[40]  Vanguard, *VMFXX – Vanguard Federal Money Market Fund*, https://investor.vanguard.com/investment-products/mutual-funds/profile/vmfxx (last visited May 5, 2025).

[41]  Baird, *Cash Sweep Program*, https://www.rwbaird.com/cashsweeps/ (last visited May 5, 2025).

42.    The following chart depicts the highest annual rates offered under the Sweep Programs to customers with deposits below $1,000,000 and the highest annual rates for the money market mutual funds to which Fidelity, Vanguard, and R.W. Baird automatically sweep customer cash and for Stifel's Smart Rate Program:



43.    As depicted above, unlike the sweep rates paid under the Sweep Programs to customers with deposits below $1,000,000, the other rates (including Stifel's own Smart Rate Program) generally moved in unison with interest rate benchmarks, like the federal funds rate.  To illustrate, the following chart depicts the monthly average federal funds effective rate from 2019 to present:



44.    The sweep rates paid to customers with deposits greater than $1,000,000 lagged far behind competitors and the federal funds rate too.  As depicted below, while competitors' rates soared alongside the federal funds rate, Stifel's rates on deposits of more than $1,000,000 only marginally increased:



45.     Meanwhile, since at least as early as March 2023, Stifel has offered the ICS Program to its private banking clients, who similarly earn yields on idle cash swept into deposit accounts at a network of banks provided by IntraFi ("IntraFi Deposit Network").  From in or around March 2023 through November 2024, customers earned a yield of 4.15% on cash swept to banks in the IntraFi Deposit Network under the ICS Program.  During that same period, however, customers earned yields between 0.15% and 2.00% on idle cash swept under the Sweep Programs.  Today, all of the Sweep Banks in the Sweep Programs are part of the IntraFi Deposit Network.[42]  Nevertheless, customers in the ICS Program earn a yield of 3.15% on cash swept to banks in the IntraFi Deposit Network, while customers in the Sweep Programs earn yields between 0.01% and 1.50% on cash swept to the Sweep Banks.  In other words, despite the similarity between the ICS Program and Sweep Programs, Stifel offers customers vastly different rates.

46.     Even other competitors, who themselves may have been paying unreasonably low sweep rates, have been dwarfing the paltry sums paid under the Sweep Programs. For example, competitor Vanguard's sweep rate is 3.65%,[43] Fidelity's is 2.21%,[44] and R.W. Baird's is between 1.45% and 2.89%.[45]

47.     As further evidence of the unreasonableness of the sweep rates, at least two of Stifel's Affiliated Banks, SB&T and Stifel Bank, participate as program banks in the sweep programs of Stifel's competitors and pay competitors' customers higher rates of interest.  Since at

---

[42]    IntraFi, *Network Banks*, https://www.intrafi.com/network-banks (last visited May 5, 2025).

[43]    Vanguard, *Earn 3.65% APY with the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited May 5, 2025).

[44]    Fidelity, *Fidelity Cash Management Account*, *supra* note 39.

[45]    Baird, *Cash Sweep Program*, *supra* note 41.

least as early as September 29, 2023, for example, SB&T and Stifel Bank have been Program Banks for Edward Jones' sweep program, which currently pays rates of interest ranging from 0.45% to 2.00%.[46] On top of the rates paid to customers, SB&T and Stifel Bank also pay Edward Jones a fee of "as much as the Federal Funds Target – Upper Limit or 5.25% annually, whichever is greater."[47] Thus, SB&T and Stifel Bank pay far more in exchange for their use of idle customer cash swept from Edward Jones than they do for idle customer cash swept from their affiliate, SN&C.

48.     In addition, some of Stifel's competitors use some of the same Unaffiliated Banks on the Bank Priority Lists. But those same banks pay far higher rates to customers of Stifel's competitors than they do to Stifel's customers. For example, Vanguard's bank sweep option sweeps idle customer cash into money market deposit accounts at a host of Program Banks, including Wells Fargo Bank, N.A., which pay Vanguard customers rates of interest of 3.65%.[48] Wells Fargo Bank, N.A., which has appeared since at least as early as January 2019 on various Priority Bank Lists for the IBD Program, pays Stifel customers 1.50%, at most.

---

[46]  Edward Jones, *Edward Jones Insured Bank Deposit List of Program Banks for Personal Accounts* (Apr. 28, 2025), https://www.edwardjones.com/sites/default/files/acquiadam/2023-07/LGL-8812BF-A-1.pdf; Edward Jones, Current Rates, https://www.edwardjones.com/us-en/market-news-insights/stock-market-news/current-rates (last visited May 5, 2025).

[47]  Edward Jones, *Edward Jones Insured Bank Deposit Program – Program Disclosure*, https://www.edwardjones.com/sites/default/files/acquiadam/2023-06/LGL-8666-A.pdf     (last visited May 5, 2025).

[48]  Vanguard, *Vanguard Cash Deposit*, https://investor.vanguard.com/investment-products/vanguard-cash-deposit (last visited May 5, 2025); Vanguard, *Earn 3.65% APY with the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited May 5, 2025).

.

49.     As a result of the foregoing, Plaintiff and the Class (defined below) suffered, and continue to suffer, damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to Their Sweep Programs**

50.     Under the Account Agreement, SN&C agreed to act as its customers' agent in connection with the Sweep Programs.  As agent, SN&C exercised discretion and control over cash deposited into the Sweep Programs, selected the Sweep Banks, coordinated with the Sweep Banks to set interest rates, and swept customers' cash into the Sweep Banks.

51.     In addition, under the Account Agreement, SB&T agreed to act as sub-agent to SN&C in connection with the IBD Program.  As sub-agent, SB&T established the Deposit Accounts, settled deposit and withdrawal transactions at the banks, exercised discretion over the fees it accepted in exchange for customer cash, and otherwise exercised control over the cash deposited into the Sweep Programs.

52.     SN&C and SB&T, as agents under the Account Agreement, were contractually obligated to act in their customers' best interests in seeking and negotiating reasonable interest rates under the Sweep Programs.  In other words, reasonableness was implicit in the Account Agreement and governed the sweep interest rates paid to customers under the Sweep Program.

53.     Defendants violated these contractual duties by failing to pay, negotiate, and secure reasonable interest rates under both the IBD Program and RIBD Program, as discussed above.

54.     Defendants also violated their contractual duties to provide reasonable rates of return on their customers' retirement account balances pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA"), which were expressly incorporated into the Account Agreement governing retirement accounts. In particular, the "Retirement Account Addendum" to the Account Agreement states that the Deposit Accounts

under the RIBD Program "*will bear a reasonable rate of interest* as required under the exemption provided by ERISA Section 408(b)(4) or [IRC] Section 4975(d)(4), which permits the investment of retirement client assets in deposits of affiliated banks."[49]

55.    Defendants violated this contractual duty by failing to pay, negotiate, and secure reasonable interest rates under the RIBD Program, as discussed above.

56.    In addition to its contractual obligations, as an investment adviser, SN&C owed fiduciary duties to its clients under the Advisers Act.[50]  In particular, SN&C was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and were not permitted to "place its own interests ahead of the interests of its client."[51]

57.    SN&C acted as an "investment adviser" in connection with the Sweep Programs because it accepted special compensation in exchange for investment advice and for the exercise of managerial discretion over cash investments. The Account Agreement states that SN&C "considers Securities Account participation in the Program and the Program deposits as part of its overall compensation."  In addition, the Account Agreement consistently calls the automatic deposits it makes under the Sweep Programs "investments."  For instance, the Account Agreement (a) defines "Sweep Option" to mean "an investment option offered as part of the Cash Investment Service for the automatic investment of available cash balances . . . in a Securities Account"; (b) refers to both Sweep Programs together as Stifel's "Cash Investment Service" or "Automatic Cash Investment Service"; and (c) calls the Sweep Programs an "investment option."  Finally, the Sweep

---

[49]   Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 165.

[50]   *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

[51]   *Id.*

Programs allowed SN&C to exercise full managerial discretion over customer cash, including by unilaterally choosing the participating Sweep Banks, setting the rates of interest and rate tiers, and deciding the order in which the Sweep Banks received customer cash.

58.     As their customers' agents in connection with the Sweep Programs, SN&C and SB&T owed similar duties of care under common law and under Regulation Best Interest, which required them to act in their retail customers' best interests and prohibited them from placing their own interests ahead of their retail customers' interests.[52]

59.     Further evidencing the fiduciary duties undertaken by SN&C and SB&T, the Account Agreement defines a "Fiduciary" to mean "an administrator, trustee, conservator, custodian, executor, general partner, officer, personal representative, or other similar person who has a relationship of trust and confidence with, and a duty to act primarily for the benefit of, the equitable owner of the assets of a Securities account, including a fiduciary of an ERISA plan."  By acting as agent and custodian for customers in connection with the Sweep Programs, SN&C and SB&T acted as fiduciaries and owed a duty to act in their customers' best interests.

60.     However, as discussed above, SN&C and SB&T violated their fiduciary duties under the Advisers Act, Regulation Best Interest, Account Agreement, and common law by failing to act in their customers' best interests, and by placing their own interests ahead of their customers' interests, when they enriched themselves by providing customers in the Sweep Programs with unreasonably low interest rates that were well below several objective benchmarks discussed above.

61.     SN&C also owed customers contractual duties under the implied covenant of good faith and fair dealing, which precluded it from exercising its judgment in a manner that denied its

---

[52]  *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

customers the expected benefit of the contract, including a fair and reasonable rate of interest.  As described above, however, SN&C breached this duty by exploiting the changing short-term interest rate landscape to the detriment of its customers and otherwise acting in bad faith.  Indeed, while benchmark short-term interest rates skyrocketed, interest rates under the Sweep Programs stayed flat and ultimately fell to nearly zero for the lowest deposit tier, allowing Defendants to pocket an unjustified, unreasonable, and arbitrary windfall.

**Defendants Made Material Misrepresentations and Omissions Regarding Their Sweep Programs**

62.    In the Account Agreement, Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers in order to increase their financial benefits.

63.    The Account Agreement also falsely indicates that the rates passed along to customers under the Sweep Program will reflect an arm's length transaction with the Affiliated Banks, stating, the rates "***will be determined by the amount the Banks are willing to pay*** on the Deposit Accounts minus the fees paid to [SN&C] and other parties" and "may change daily."  In reality, however, the rates had no connection to the Affiliated Banks' willingness to pay and changed just twice in the course of five years. For example, under the Sweep Programs, SB&T and Stifel Bank pay as little as 0.01% in exchange for their use of idle customer cash.  As program banks for Edward Jones' sweep program, on the other hand, SB&T and Stifel Bank pay customers rates between 0.45% and 2.00% and pay Edward Jones a fee of "as much as the Federal Funds Target – Upper Limit or 5.25% annually, whichever is greater."[53]

---

[53]  Edward Jones, *Edward Jones Insured Bank Deposit Program – Program Disclosure*, https://www.edwardjones.com/sites/default/files/acquiadam/2023-06/LGL-8666-A.pdf    (last visited May 5, 2025).

64.     The Account Agreement also misleadingly stated that Stifel "requir[es] the use" of the Sweep Programs and offers the Sweep Programs as "the sole option" for eligible accounts.[54] In addition, the Terms and Conditions of the Sweep Programs, as set forth in the Account Agreement, misleadingly state the following:

> **Termination of the Cash Investment Service.**  You understand that the Cash Investment Service feature will automatically terminate if for any reason your Securities Account is closed or transferred to another financial institution. Stifel at its discretion may terminate the Cash Investment Service at any time, with or without notice, all without any liability therefor.

These statements were misleading and omitted material facts because, in reality, (a) Stifel offered customers the option to terminate their participation in the Sweep Programs[55] and (b) Stifel offered other cash management options, including its "Smart Rate Program," which "keeps [customers'] cash balances at Stifel affiliated banks through [their] securities account[s]" and pays a rate of interest of 3.85% to customers who deposit a minimum of $100,000, or a ***3750% increase*** from the rate of interest (0.10%) paid on deposits between $100,000 and $250,000 held at Affiliated Banks under the Sweep Programs.[56]

65.     The Account Agreement also misleadingly stated: (a) "The Banks ***do not generally*** offer the highest rates available or rates comparable to money market mutual fund ('Money Fund') yields.";[57] (b) "The interest rates paid with respect to the Deposit Accounts at a Bank ***may be***

---

[54]   Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 147, 154.

[55]   *Id.* at 151, 158.

[56]   *See also* Stifel Financial Corp., Annual Report (Form 10-K) (Feb. 16, 2024), at 8, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000720672/000095017024016475/sf-20231231.htm ("We utilize [money market mutual] funds sponsored by third parties in limited circumstances for our own investment purposes as well as to offer our clients as one of ***several cash sweep alternatives***.").

[57]   Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 147, 154.

*higher or lower* than the interest rates available to depositors making deposits directly with a Bank or other depository institutions in comparable accounts and for investments in money market funds and other cash equivalent investments available through Stifel.";[58] and (c) "[T]he Affiliated Banks receive substantial deposits . . . at a price that *may be less than other alternative funding sources available to them*."[59]   These statements were misleading and omitted material facts because, in reality, the Sweep Programs *always* offered rates of interest significantly below market alternatives, and the Affiliated Banks accordingly *always* received substantial deposits at a price significantly below other alternative funding sources.   In fact, based on their placement on the Priority Lists and the small "average balances" held by the "million-plus clients" in the Sweep Programs,[60] the Affiliated Banks received substantial deposits at nearly no cost at all.

66.     In addition, the Account Agreement's Retirement Account Addendum stated that the Deposit Accounts under the RIBD Program "w[ould] bear a *reasonable rate of interest* as required under the exemption provided by ERISA Section 408(b)(4) or [IRC] Section 4975(d)(4), which permits the investment of retirement client assets in deposits of affiliated banks."[61]   This statement was misleading and omitted material facts because, in reality, SN&C was coordinating with Affiliated Banks to pay unreasonably low interest rates in order to increase the financial benefits realized by Defendants from the RIBD Program.

67.     Moreover, Defendants' statements about potentially *lower* interest rates did not excuse their contractual and fiduciary obligations to pay *reasonable* interest rates, as described

---

[58]   *Id.* at 149, 157.

[59]   *Id.* at 151, 159.

[60]   Stifel Financial Corp, Quarterly Results – Earnings Call Transcript (Apr. 27, 2022).

[61]   Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 165.

above.  These statements must be construed harmoniously with Defendants' contractual and fiduciary obligations.

**Defendants Violated the RICO Statute**

68.     During the relevant period, Defendants and the Sweep Banks worked together to benefit and enrich themselves by paying unreasonably low interest rates to customers under the Sweep Programs.  In furtherance of this common purpose, Defendants and the Sweep Banks concocted a scheme to falsely represent: (a) that the sweep rates paid under the Sweep Programs would reflect the Sweep Banks' willingness to pay; (b) that the sweep rates would increase or decrease based on the Sweep Banks' willingness to pay; (c) that the sweep rates, accordingly, were conceived through arm's length or otherwise legitimate negotiations or processes; and (d) that SN&C and SB&T, as agents and fiduciaries, would act in their customers' best interests in setting rates and fees under the Sweep Programs.

69.     In reality, throughout the relevant period, Defendants and the Sweep Banks took advantage of the managerial discretion afforded to SN&C and SB&T under the Sweep Programs and coordinated to keep interest rates under the Sweep Programs as low as possible in order to maximize their profits.  Indeed, while continuously leading customers to believe sweep rates would reflect an arm's length transaction, Defendants increased the rates paid under the Sweep Programs just once in nearly five years, even as the Sweep Banks' willingness to pay quickly increased alongside the fast-increasing federal funds rate and other interest rate benchmarks.

**The Sweep Enterprise**

70.     Defendants and the Sweep Banks associated together for a common purpose of benefitting and enriching themselves through, among other things: (a) paying unreasonably low interest rates to customers under the Sweep Programs; (b) abusing the managerial discretion provided under the Sweep Programs; (c) breaching the fiduciary, contractual, and other duties

arising under the Sweep Programs; and (d) making false and misleading statements and omissions relating to such interest rates and duties. In other words, Defendants and the Sweep Banks operated as an association-in-fact enterprise ("Sweep Enterprise"), as defined by 18 U.S.C. §1961(4).

71.     The Sweep Enterprise is an ongoing and continuing organization of corporations and banks, which have been coordinating to execute a common purpose since at least as early as March 2020. During that time and still today, participants in the Sweep Enterprise, through corporate ties, contractual relationships, and financial arrangements, continuously coordinated to achieve the common purpose of the enterprise. For example, throughout the relevant period, SN&C and SB&T, acting as agents and fiduciaries for their customers, agreed to the deposit terms and conditions at the Sweep Banks, transferred cash balances to and from the Sweep Banks, worked together with the Sweep Banks to set sweep rates, and exercised discretion in charging the Sweep Banks a fee. In addition, throughout the relevant period, Stifel acted as a control person of SN&C, SB&T, and the Affiliated Banks, and upon information and belief, was involved in the coordination of the members of the Sweep Enterprise and communications regarding the sweep rates.

72.     Defendants and the Sweep Banks were each "person[s]" as defined under the RICO Statute because each is capable of holding a legal or beneficial interest in property.

73.     Each member of the Sweep Enterprise played a role in furthering its common purpose and operated separately and distinctly from the Sweep Enterprise. SN&C primarily acts as broker-dealer and investment advisor and does not ordinarily control, set, or otherwise influence the rates of interest offered by banks, including the Affiliated Banks. In its capacity as a member of the Sweep Enterprise, however, SN&C set interest rates with the Sweep Banks, created deposit tiers, and established the deposit priority lists. Its influence over the sweep rates, deposit tiers, and

priority lists helped maximize the profits of the Sweep Enterprise, including by channeling approximately the first $1,000,000 in idle customer cash to the Affiliated Banks.

74.     In addition, SN&C managed the Sweep Programs and published and disseminated the Account Agreement, which contained fraudulent misstatements and omissions. These fraudulent misstatements and omissions furthered the purposes of the Sweep Enterprise by leading customers to falsely believe, among other things, that Defendants and the Sweep Banks agreed to rates of interest and fees at arm's length and that SN&C set sweep rates, created deposit tiers, and established priority lists consistent with its duties as agent and fiduciary.

75.     SB&T acted as both a Sweep Bank and sub-agent and sub-custodian in connection with the IBD Program, with discretion over the fees charged to Unaffiliated Banks.  As a bank, SB&T does not ordinarily act or exercise discretion on behalf of customers of broker-dealers and investment advisors.  In its capacity as a member of the Sweep Enterprise, however, SB&T established customer accounts at the Sweep Banks, settled transactions on behalf of customers, and acted as an intermediary between the Sweep Banks and SN&C.  SB&T also helped maximize the profits of the Sweep Enterprise by charging the Unaffiliated Banks a discretionary fee, which far exceeded the rates of interest the Unaffiliated Banks had to pay to customers.

76.     Stifel, as a control person of SN&C, SB&T, and the Affiliated Banks, oversaw the Sweep Enterprise, and upon information and belief, assisted in rate-setting and other decision-making for the Sweep Enterprise, including decisions regarding the addition or subtraction of Unaffiliated Banks.

77.     The Affiliated Banks worked together with Stifel and SN&C to set sweep rates and used the low-cost sweep deposits to earn profits for the Sweep Enterprise and themselves.

78.     The Unaffiliated Banks also worked together with Stifel and SN&C to set sweep rates and earned profits off of the sweep deposits.  In addition, in some cases, the Unaffiliated

Banks agreed to reciprocal deposit arrangements, through which they would accept sweep deposits from the Sweep Programs and send reciprocal deposits to the Affiliated Banks.

**The Racketeering Acts**

79. Defendants, each a person associated-in-fact with the Sweep Enterprise, knowingly, willfully, and unlawfully conducted or participated in, directly or indirectly, the affairs of the Sweep Enterprise through a pattern of racketeering activity within the meaning of the RICO Statute ("Racketeering Acts").

80. Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on Defendants' fraudulent use of interstate mail and wire communications. In particular, Defendants orchestrated a scheme to intentionally defraud customers by coordinating with the Sweep Banks to pay unreasonably low interest rates to customers in the Sweep Programs and by concealing the scheme through false and misleading documents and disclosures, including the Account Agreement, which were posted on Stifel's public website and distributed to customers throughout the country.

81. The mailings and transmittals number in the millions, and each constitutes "racketeering activity" within the meaning of the RICO Statute. Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of the RICO Statute. This pattern of racketeering activity amounted to a course of conduct, with similar patterns and purposes, intended to deceive Plaintiff and the Class.

82. The Sweep Programs involved commercial activities across state lines, including Defendants' distribution of the Account Agreement and other documents and disclosures to customers, and Defendants' transferal and receipt of customer cash to and from the Sweep Banks.

83.    The Racketeering Acts were related in that they were taken in furtherance of Defendants' Sweep Programs scheme.  The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Sweep Programs.

**The Conspiracy**

84.    Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c).  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including posting the materially false and misleading documents and disclosures, such as the Account Agreement, on the public website of Stifel and distributing them to customers throughout the country.

85.    As customers of the Sweep Programs, Plaintiff and the Class (defined below) were damaged by Defendants' Racketeering Acts due to Defendants' payment of unreasonably low interest rates on the money customers deposited into the Sweep Programs.

## CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action against Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all Stifel customers who had cash deposits or balances in the Sweep Programs.  Plaintiff also brings this action against Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Subclass consisting of all Stifel customers who had cash deposits or balances in retirement accounts in the Sweep Program (the "Retirement Account Subclass").

87.    Excluded from the Class and Retirement Account Subclass are Defendants, officers and directors of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

88.     The Class members are so numerous that their individual joinder is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, and are geographically dispersed, because Stifel oversees approximately $510 billion in client assets worldwide.

89.     Plaintiff's claims are typical of Class members' claims because Plaintiff's cash deposits were subject to the Sweep Programs, and, therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful conduct by Defendants alleged herein.

90.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in complex class action litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

91.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Class members to protect their interests.

92.     Because Defendants act or refuse to act on grounds that apply generally to the Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

94.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants act on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the laws as alleged herein;

(b)    whether SN&C and SB&T owed fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(c)    whether SN&C and SB&T breached their fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(d)    whether SN&C and SB&T breached their contractual obligations to Plaintiff and members of the Class in connection with the Sweep Programs;

(e)    whether Defendants violated the Advisers Act;

(f)    whether Defendants violated the RICO Statute;

(g)    whether Defendants made material misrepresentations and/or omissions in connection with the Sweep Programs;

(h)    whether Defendants were unjustly enriched by their wrongful conduct;

(i)    whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(j)    whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT I

## BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS

95.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

96.     During the relevant time period, SN&C was the agent of, and investment advisors to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  Stifel owned and controlled SN&C.

97.     During the relevant time period, SB&T was the agent of customers enrolled in the IBD Program, including Plaintiff and members of the Class.  Stifel owned and controlled SB&T.

98.     SN&C and SB&T owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

99.     SN&C and SB&T violated their duties to act in the best interests of Plaintiff and the Class by using the Sweep Programs to enrich themselves, Stifel, and the other Sweep Banks at the expense of customers who were paid unreasonably low interest rates, as described above.

100.    SN&C also violated its duties to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Account Agreement, as described above.

101.    Further, SN&C violated its duties to act with reasonable care to verify the truthfulness of the information set forth in the Account Agreement, which was materially misleading and omitted material facts for the reasons described above.

102.    As a direct and proximate result of SN&C's and SB&T's breaches of fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

**COUNT II**

**VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940 AGAINST DEFENDANTS STIFEL AND SN&C**

103.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

104.    During the relevant time period, SN&C was registered as an investment adviser under the Advisers Act and acted as an agent with full discretion, management, and control over

cash deposited by customers into the Sweep Programs. SN&C selected the Sweep Banks that received deposits, coordinated with the Sweep Banks to set interest rates on the deposits, and swept the deposits into the Sweep Banks. Stifel owned and controlled SN&C.

105. Section 215(b) of the Advisers Act provides that every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

106. The Account Agreement is voidable under Section 215(b) of the Advisers Act because it was made in violation of Section 206 of the Advisers Act, which prohibits any investment adviser from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, "to employ any device, scheme, or artifice to defraud any client or prospective client"; "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client"; or "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. §80b-6(1)-(2), (4).

107. SN&C violated Section 206 of the Advisers Act through its fraudulent Sweep Programs scheme, whereby SN&C coordinated with the SB&T and the Sweep Banks to pay unreasonably low sweep interest rates to clients in order to Defendants' financial benefits from the Sweep Programs. To conceal the scheme, Stifel and SN&C intentionally deceived, defrauded, and manipulated clients by making materially false and misleading statements and omissions

(discussed above) about the Sweep Programs in the Account Agreement posted on Stifel's public website and distributed to customers throughout the country. In other words, SN&C made the Account Agreement in violation of Section 206 of the Advisers Act.

108.    The performance of the Account Agreement also required SN&C to violate Section 206 of the Advisers Act, making it voidable under Section 215(b) of the Advisers Act. Under Section 206 of the Advisers Act, SN&C was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client." Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019); 17 C.F.R. §275.206(4)-7. The Account Agreement required SN&C, however, to subordinate the interests of clients in the IBD Program to SB&T, which acted as sub-agent and, among other benefits, collected a discretionary fee from the Unaffiliated Banks.

109.    As a result of these violations, the Account Agreement should be deemed void pursuant to Section 215(b) of the Advisers Act.

110.    Accordingly, Plaintiff seeks rescission of the Account Agreement and restitution of the consideration given pursuant to their purported terms.

## COUNT III

## BREACH OF CONTRACT AGAINST DEFENDANTS STIFEL AND SN&C

111.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

112.    Plaintiff and Class members were parties to the Account Agreement with SN&C and/or Stifel. The Program Documents set forth the contractual terms and conditions of the Sweep Programs. Stifel owned and controlled SN&C.

113.    Pursuant to the Account Agreement, SN&C was contractually obligated to act as agent on behalf of Plaintiff and the Class, and, thus, was contractually obligated to act in Plaintiff's

and the Class' best interests in seeking and negotiating reasonable sweep interest rates under the Sweep Programs.

114.    SN&C breached its contractual obligations by failing to provide Plaintiff and the Class with reasonable interest rates on their deposits in the Sweep Programs.  Rather, the sweep interest rates provided by SN&C were below market and unreasonably low.  As such, SN&C denied Plaintiff and the Class the full benefit of their bargain under the Account Agreement.

115.    As a direct and proximate result of SN&C's breach of contract, Plaintiff and the Class sustained damages.

**COUNT IV**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS STIFEL AND SN&C**

116.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

117.    Plaintiff and Class members were parties to the Account Agreement with SN&C and/or Stifel.  The Account Agreement set forth the contractual terms and conditions of the Sweep Programs.  Stifel owned and controlled SN&C.

118.    Implicit in the Account Agreement were duties of good faith and fair dealing.

119.    SN&C and Stifel breached their duties of good faith and fair dealing by failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs.  Rather, the interest rates provided by SN&C and Stifel were below market and unreasonably low.  As such, SN&C and Stifel denied Plaintiff and the Class the full benefit of their bargain under the Account Agreement.

120.    As a direct and proximate result of SN&C's and Stifel's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT V

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d), AGAINST ALL DEFENDANTS

121.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

122.    This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provides in relevant part:

> (c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

123.    At all relevant times, Defendants were "person[s]" as defined under the RICO Statute because each is capable of holding a legal or beneficial interest in property.

124.    Each Defendant is a separate entity and "person" that is distinct from the RICO enterprise alleged below.

125.    The RICO enterprise is an association-in-fact enterprise consisting of the Defendants and the Sweep Banks.  The association-in-fact enterprise is, for purposes of this claim, referred to as the "Sweep Enterprise."

126.    The Sweep Enterprise is a separate, ongoing, and continuing business organization consisting of corporations and individuals associated for the common purpose of benefitting and enriching themselves through, among other things, paying unreasonably low interest rates under the Sweep Programs and making false and misleading statements and omissions relating to such interest rates.

127.    The participants in the Sweep Enterprise were systemically linked through contractual relationships, financial arrangements, corporate ties, and the ongoing coordination of activities.

128.    During the relevant period, the Sweep Enterprise: (a) had an existence separate and distinct from each Defendant and Sweep Bank; (b) was separate and distinct from the pattern of racketeering in which the Defendants were engaged; and (c) was an ongoing and continuing organization consisting of Defendants and the Sweep Banks associated for a common purpose.

129.    As described above, Defendants managed the Sweep Enterprise through, among other things, frequent communication with the Sweep Banks regarding the rates of interest under the Sweep Programs and daily deposits into and withdrawals from the Sweep Banks on behalf of their customers.

130.    The Sweep Enterprise involved commercial activities across state lines, including the distribution of the Program Documents to customers, and the receipt and transfer of customer cash from and into the Sweep Banks.

131.    Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Sweep Enterprise.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Sweep Programs over a multi-year period, constituted a "pattern of racketeering activity."  The Racketeering Acts were made possible by the regular, repeated, and continuous use of the employees, facilities, and services of the Defendants.

132.    Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a)    **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending and receiving materials via U.S. mail and commercial interstate carriers for the purpose of conducting the fraudulent Sweep Programs scheme, including the Account Agreement.  As described above, the Account Agreement contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

- 37 -

(b)  **Wire Fraud**: Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Programs scheme.  The writings included the Account Agreement, which was posted on Stifel's public website.  As described above, the Account Agreement contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

133.    Each mailing, transmittal, or receipt described above constitutes a "racketeering activity" within the meaning of the RICO Statute.  Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of the RICO Statute.  This pattern of racketeering activity amounted to a course of conduct, with similar patterns and purposes, intended to deceive Plaintiff and the Class.

134.    In addition, Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Enterprise, including mailing and transmitting the materially false and misleading Account Agreement to customers.

135.    Defendants and each other member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to pay unreasonably low rates of interest under the Sweep Programs and make materially false and misleading statements in connection with those interest rates.

136.    Indeed, for the conspiracy to succeed, Defendants' co-conspirators had to agree to pay unreasonably low interest rates, which oftentimes fell far below the interest rates the co-conspirators paid under sweep programs of Defendants' competitors.

137.    Plaintiff and the Class suffered damages by reason of Defendants' payment of unreasonably low interest rates on their deposits in the Sweep Programs, in violation of 18 U.S.C. §1962(c)-(d).

138.    Plaintiff's and the Class' injuries were directly and proximately caused by Defendants' racketeering activity.

## COUNT VI

## NEGLIGENCE AGAINST ALL DEFENDANTS

139.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

140.    During the relevant time period, SN&C was the agent of, and investment advisor to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  SB&T also facilitated the Sweep Programs by establishing Deposit Accounts, settling deposits and withdrawals, and collecting fees from unaffiliated banks in connection with the IBD Program. Stifel owned and controlled SN&C and SB&T.

141.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

142.    Defendants' conduct with respect to the Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs, Defendants breached their duty to act with reasonable care.

143.    Defendants' negligence directly and proximately caused harm to Plaintiff and the Class.

## COUNT VII

## NEGLIGENT MISREPRESENTATIONS AND OMISSIONS AGAINST ALL DEFENDANTS

144.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

145.    During the relevant time period, SN&C was the agent of, and investment advisor to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  SB&T also facilitated the Sweep Programs by establishing Deposit Accounts, settling deposits and withdrawals, and collecting fees from unaffiliated banks in connection with the IBD Program. Stifel owned and controlled SN&C and SB&T.

146.    Stifel owned and controlled SN&C and SB&T.

147.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

148.    Defendants negligently made material misrepresentations and omissions in the Account Agreement, as described above, which was posted on Stifel's public website.

149.    Plaintiff and the proposed Class justifiably relied on Defendants' Account Agreement and accordingly deposited and maintained cash balances in the Sweep Programs to their detriment.

150.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Class.

**COUNT VIII**

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349 AGAINST ALL DEFENDANTS**

151.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

152.    Defendants' acts and practices with respect to the Sweep Programs, as described above, constituted unlawful, unfair, misleading, and deceptive business acts and practices in violation of §349 of New York's General Business Law ("GBL").

153.    Defendants' misleading and deceptive business acts and practices with respect to the Sweep Programs adversely impacted Plaintiff and the Class, and, therefore, constituted

consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Class.

154.    Accordingly, Plaintiff and the Class seek appropriate relief under GBL §349, including injunctive relief and damages.

## COUNT IX

## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

155.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

156.    Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the Class unreasonably low and below-market interest payments on their balances in the Sweep Programs.  These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

157.    As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

158.    Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest

thereon;

C.      Awarding treble damages in favor of Plaintiff and the Class;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

E.      Ordering rescission of the Account Agreement and restitution of all fees and other benefits received by Defendants thereunder; and

F.      Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  May 5, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
STEPHEN R. ASTLEY #0139254 (FL)
ANDREW T. REES #0062247 (FL)
RENE A. GONZALEZ #1057852 (FL)
SCOTT I. DION #1052005 (FL)
ALEX KAPLAN, #1030761(FL)

*s/ Stephen R. Astley*

STEPHEN R. ASTLEY

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sastley@rgrdlaw.com
arees@rgrdlaw.com
rgonzalez@rgrdlaw.com
sdion@rgrdlaw.com
akaplan@rgrdlaw.com

EDELSBERG LAW
ADAM A. SCHWARTZBAUM
20900 NE 30TH Avenue, Suite 417
Aventura, FL  33180
Telephone:  786/289-9471
Adam@edelsberglaw.com

*Attorneys for Plaintiff*